UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00084-DJH

LOUISVILLE MARKETING, INC.                                    Plaintiff/
d/b/a as JEWELRY IN CANDLES                        Counterclaim Defendant

v.

JEWELRY CANDLES, LLC                                          Defendant/
                                                        Counterclaimant

v.

P. MICAH BUSE                                        Third-Party Defendant

MEMORANDUM, OPINION,
AND ORDER

Plaintiffs Louisville Marketing, Inc., doing business as Jewelry in Candles, and Micah

Buse (collectively referred to herein as "LMI") have filed two motions in limine and one motion to

strike relating to proposed expert testimony and reports proffered by Defendant Jewelry Candles,

LLC ("JC") (DN 30, DN 31, DN 33).   JC filed responses (DN 49, DN 50), and LMI has replied

(DN 54, DN 55, DN 56).   These matters are ripe for adjudication.


I. Background

Around July of 2012, Osagie Enaiho ("Enaiho") was operating an online business named

Jewelry Candles ("JC"), which sells candles and wax tarts that contain concealed jewelry items.

(DN 6, at p. 6).   Enaiho operated his business as a sole proprietor until about April 30, 2013,

when he formed Jewelry Candles, LLC, as a Delaware limited liability company where he served

as the sole member and owner. (Id.)   Over a month later, JC applied for federal registration of a

composite word mark stating "Jewelry JC Candles A Hidden Jewel Inside Every Candle," which the USPTO granted.  (Id. at pp. 7-8).  JC has also applied for federal registration of "Jewelry Candles" and "Jewelry Candle" as word marks, but these applications remain pending before the USPTO.  (Id.).

In January of 2013, Enaiho contacted Louisville Marketing, Inc. ("LMI") through LMI's website seeking information about search engine optimization ("SEO") and search engine marketing ("SEM") services and graphic design services. (Id. at p. 9).  LMI's owner, Paul Micah Buse ("Buse"), responded to Enaiho's request and asked for analytic reports and non-public analytics about JC's website. (Id.).  Enaiho and Buse continued to communicate through e-mail for several days, discussing JC's business and efforts to protect its intellectual property. Specifically, Buse indicated in an e-mail to Enaiho that he needed to secure his brand by trademarking his product and idea before someone could steal it.   (Id. at p. 10).   On the same day Buse sent that e-mail, and unbeknownst to Enaiho, Buse registered the domain jewelryincandles.com.  (Id.).  Several days later, Buse and Enaiho met in person, and Buse disclosed he had no interest in LMI providing marketing services to JC, but, rather, Buse wanted to become partners with Enaiho and obtain an equity stake in JC.  (Id. at p. 11).  Enaiho declined Buse's offer. (Id.).

A few weeks later, LMI applied to assume the name "Jewelry in Candles" in Kentucky and filed the application with the Kentucky Secretary of State. (Id. at p. 11).  JC believes LMI launched a competing online business around May 4, 2013, selling candles containing jewelry items under the trade name "Jewelry in Candles."   As a result, JC filed a WIPO Complaint on

2

January 5, 2014, initiating proceedings requesting the transfer of LMI's jewelryincandles.com domain name and alleging that LMI is infringing on its trademark rights.

LMI filed its Complaint with this Court on January 23, 2015, seeking a declaratory judgment that the term "Jewelry in Candles" is a generic term for candle products with jewelry in them, and, as such, LMI is not infringing on JC's styled design mark by making, using, selling, and offering to sell its candles with jewelry inside of them (DN 1, at pp. 6-7).   JC filed an answer and counterclaim, alleging trademark infringement, unfair competition and false designation of origin, unfair competition in Kentucky, and requesting injunctive relief (DN 6).

In the instant motions, LMI seeks to exclude the expert testimony and reports of Scott Clark and Dr. John Peloza. (DN 30, DN 31, DN 33).

## II. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the   evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

3

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny, Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court charged trial courts with acting as "gatekeepers" to ensure expert testimony admitted pursuant to FRE 702 is relevant and reliable. Daubert also identified a list of non-exhaustive factors to assess expert testimony reliability, including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance: in the "relevant scientific community." 509 U.S. at 593-94. Daubert's gatekeeping obligation applies not only to "scientific" testimony, but to all expert testimony. Shepherd v. Unumprovident Corp., 381 F. Supp. 2d 608, 610 (E.D. Ky. 2005).

No matter how good an expert's credentials may be, his opinion must be "supported by more than subjective belief and unsupported speculation." McLean v. Ontario, Ltd., 224 F.3d 797, 800-01 (6th Cir. 2000) (citation omitted); *see also* Tamraz v. Lincoln Elec., Co., 620 F.3d 665, 671-72 (2010). When the subject matter of an expert's testimony is "within the knowledge or experience of laymen," the testimony is superfluous. Bartak v. Bell-Galyardt & Wells, Inc., 629 F.2d 523, 530 (8th Cir. 1980) (citing Bridger v. Union Ry., 355 F.2d 382, 387 (6th Cir. 1966)).

### III. Analysis

### A. Scott Clark's Expert Opinion

LMI's first motion in limine seeks to exclude JC from offering the testimony, report, or conclusions of its expert, Scott Clark ("Clark"). (DN 30-1, at p. 1). LMI argues that Clark's

report must be excluded under Fed. R. Evid. 702 because it is "superfluous, unreliable and speculative" (Id. at p. 3).

### 1. Whether Clark Qualifies as an Expert

As noted above, Rule 702 specifies that a witness may offer expert testimony only if he is "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "The qualification, however, must match up with the subject matter about which the expert is to testify[.]" Elswick v. Nichols, 144 F. Supp. 2d 758, 766 (E.D. Ky. 2001). Rather than assessing the "qualifications of a witness in the abstract," the Court must assess "whether those qualifications provide a foundation for a witness to answer a specific question." Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994).

LMI argues that Clark is not properly qualified as an expert because he fails to demonstrate he has any specialized knowledge or skill with regard to "psychology and motivation, business ethics or fiduciary duty, or trademarks and the corresponding implications of descriptiveness, genericness, or secondary meaning." (DN 30-1, at p. 6). LMI concedes that Clark "*may* be an expert in marketing" but states he has not demonstrated any specialized knowledge in arriving at his speculative conclusions. (Id.). JC counters that Clark is not going to testify regarding any of the areas mentioned by LMI and the experience in Clark's resume is more than sufficient to allow his testimony about the remaining matters in the report. (DN 50, at p. 4). LMI's reply emphasizes that Clark lacks expertise with regard to "industry standards" and, thus, his observations of what is usual or unusual in the industry are not supported by any objective standard (DN 54, at p. 6). LMI similarly argues that Clark has demonstrated no particular expertise regarding his data

extrapolation and analysis and does not substantiate his generalized conclusions with any existing data or authority (Id.).

Clark has a Bachelor of Arts in Computer Science, obtained from Southern Illinois University in 1988. (DN 30-2, at p. 3).   He has worked for over fifteen years as a senior search engine optimization and search engine advertising consultant at BuzzMaven, Inc., providing solutions for search marketing, social media, and paid search. (Id. at p. 8).   Previously Clark has worked as an e-commerce consultant and developer at BuzzMaven (1997-2004), manager of software design teams at Pearson Education (1992-1998), and software engineer at Software Publishing Corporation (1990-1992) and at Kaiser Electronics (1988-1991). (Id.).   Clark clearly has experience with digital and search marketing.

The relevant question then is whether Clark's knowledge and skill as an internet marketing expert provide a sufficient foundation for him to address JC's inquiries.   JC asked Clark to give his opinions as to: (1) How an experienced internet marketing consultant would have interpreted the information disclosed by Mr. Enaiho to Mr. Buse in January 2013; (2) Mr. Buse's registration of jewelryincandles.com just days after meeting with Mr. Enahio; (3) The significance of the initial registrations of the jewelrycandles.com and jewelryincandles.com domains in 2012 and 2013; and (4) The domain name histories for JewelryCandles.com prior to May 2012 and for JewelryinCandles.com prior to January 2013.   (DN 30-2).   Clark's fairly extensive experience with digital and search marketing/consulting persuades the Court that he is sufficiently qualified to testify as an expert for the enumerated issues.

### 2. Section Seven of Clark's Report

Beyond Clark's qualification as an expert, LMI also argues for exclusion of specific portions of Clark's opinion.  First LMI takes issue with section seven of Clark's opinion, contending that Clark's testimony concerns "state of mind, subjective motivation, or intent." (DN 30-1, at p. 4).  This testimony, LMI contends, improperly describes lay matters which the jury is capable of understanding and deciding without expert assistance.  (Id.).  In response, JC explains Clark is not opining as to state of mind or subjective motivation but, rather, is making an objective assessment about how an experienced internet marketing consultant would have viewed the success of JC (DN 50, at pp. 1-2).  LMI replies that only Buse's motivation and intent is at issue in this case and JC's attempts to generalize Clark's opinion in this regard are improper (DN 54, at pp. 2-3).

Section seven of Clark's expert report reads as follows:

> I have been asked my opinion as to how the information Mr. Enaiho allegedly disclosed to Mr. Buse in January 2013 would have been interpreted by an experienced internet marketing consultant at that time.  In forming my opinion, I have reviewed emails [sic] exchanges and email attachments from January 2013 between Mr. Enaiho and Mr. Buse.  *In my opinion, the information provided by Mr. Enaiho to Mr. Buse would have indicated to an experienced internet marketing consultant that JC was successful [sic] startup company with the potential for a strong future.*

(DN 30-2, at p. 3) (emphasis added).

LMI is correct that a party's "state of mind" or intent is subjective and does not fall within an expert's knowledge.  *See* ISP Chems LLC v. Dutchland, Inc., No. 5:08-CV-153, 2011 WL 2651691, at *7 (W.D. Ky. July 6, 2011); Johnson v. Baker, No. 1:08-CV-00038, 2009 WL 3486000, at *5 (W.D. Ky. Oct. 23, 2009).  Here, Clark does not specifically opine as to Buse's

state of mind or intent but instead generally opines as to what an "experienced marketing consultant" would have believed when given the information about Jewelry Candles.    Although Clark's statement is not a categorical "state of mind" opinion, it nonetheless should be excluded based on speculation.   Clark's statement that an experienced internet marketing consultant would have found JC was a successful startup company with the potential for a strong future appears to be based on subjective belief and is not based on facts that can be substantiated.   The Court excludes this testimony.

### 3. Section Eight of Clark's Report

LMI next argues that Clark's conclusion in section eight that Buse's actions in registering the domain name of jewelryincandles.com were "highly unusual and possibly unethical" because an expert may not testify to implications of conduct. (DN 30-1, at p. 5).   JC concedes that Clark's characterization of Buse's conduct as "possibly unethical" should be withdrawn from Clark's report. (DN 50, at p. 2).   JC maintains, however, the remainder of section eight discussing Buse's conduct is appropriate testimony as to the "customs, standards, and duties" of an industry and is based on Clark's twenty years of experience. (Id. at p. 2).   In reply, LMI notes that Clark fails to cite to an industry standard and fails to explain how Buse's allegedly "unusual" actions deviate from such standard. (DN 54, at p. 3).

Because the parties have already agreed that Clark's opinion that Buse's actions were "possibly unethical" should be excluded, the only remaining statement from section eight at issue is Clark's opinion that Buse's actions were "highly unusual."   (DN 30-2, at p. 4).   Specifically, Clark explains he is not aware of any internet marketing consultant or web designer purchasing domain name assets on behalf of the potential client or for his or her unrelated use.   (Id.).

8

Clark's opinion that Buse's conduct was "highly unusual" should also be excluded.   In

Gen. Elec. Co. v. Joiner, the Supreme Court advised:

> Trained experts commonly extrapolate from existing data.   But nothing in Daubert
> or the Federal Rules of Evidence requires a district court to admit opinion evidence
> that is connected to existing data only by the *ipse dixit* of the expert.   A court may
> conclude that there is simply too great an analytical gap between the data and the
> opinion offered.

522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (citing Turpin v. Merrell Dow Pharm.,

Inc., 959 F.2d 149, 1360 (6th Cir. 1992)).   Here, the so-called "data" and industry standards

discussed by Clark are vague and rely only on his "experience in the internet marketing industry."

(DN 30-2, at p. 4).   Even granting Clark his 20 years of experience, his opinion that Buse's

conduct was "highly unusual" is speculative, subjective, and incapable of independent

verification.   This Court is not convinced Clark's experience suffices to render a reliable

foundation for his conclusions in section eight.   Because the Court finds section eight of Clark's

opinion to be speculative, it is properly excluded under Daubert and FRE 702.

### 4. Sections Nine and Ten of Clark's Report

LMI's third argument deals with Clark's conclusions in sections nine and ten that the

phrases "jewelry candle" and "jewelry candles" were not commonly searched prior to 2013 as they

were not generic or commonly used terms in the minds of consumers at that time. (DN 30-1, at p.

5).   Clark's conclusion, according to LMI, is unsupported and has no bearing on the issue of

descriptiveness or genericness.   LMI states that data merely reflecting consumer awareness is

irrelevant. (DN 30-1, at pp. 5-6 (citing Invisible Fences, Inc. v. Fido's Fences, Inc., No.

3:09-CV-25, 2014 U.S. Dist. LEXIS 16663, at *28-*29 (E.D. Tenn. Feb. 11, 2014)).

JC acknowledges that Clark's use of the term "generic" is impermissible under Sixth Circuit law and states it will not offer testimony from Clark in any matter that any terms in the case are "generic." (DN 50, at p. 3). As for LMI's consumer awareness argument, JC explains the cases LMI cites to are distinguishable. JC argues that Invisible Fences relies on Stuhlbarg Intn'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 840 (9th Cir. 2001), where the expert witness appeared to simply ask survey participants if they were aware of a given term. JC contrasts that in this case Clark analyzed industry data to opine that the phrases "jewelry candles" and "jewelry in candles" were not commonly used terms for any products. (Id. at p. 4).

Section nine of Clark's report is labeled "Significance of the initial registrations of the jewelrycandles.com and jewelryincandles.com domains in 2012 and 2013." In this section, Clark produces "Figure 1" from "Google Trends Data," which demonstrates that the phrase "jewelry candles" had no measurable search visibility prior to late 2012 and the search frequency for the term remained low until late 2013. Clark concludes that "jewelry candles" was not a generic or commonly used term in the minds of online consumers for a type of product during that time period. (DN 30-2, at p. 5).

Similarly, section ten of Clark's report is titled "Domain name histories for JewelryCandles.com prior to May 2012 and for Jewelryincandles.com prior to January 2013." Clark explains that from a website history tool, WaybackMachine.com, along with a domain history report, Mr. Enaiho appears to be the original registrant of jewelrycandles.com in May of 2012, and Mr. Buse appears to be the original registrant of jewelryincandles.com in January of 2013. Clark concludes: "[i]f the phrase "jewelry candles" had been a generic or commonly used term at these times, it is my opinion that neither domain would have been available for original

registration on the primary market" and "[a]s a result, it is highly unlikely that "jewelry candles" was a generic or commonly used term in 2012 and early 2013."   (Id. at p. 6).

First, the parties and the Court are in agreement that Clark's testimony that the phrases "jewelry candle" and "jewelry candles" were not "generic" or commonly used in the minds of online consumers should be excluded.   *See* Woods v. Lecureux, 110 F.3d 1215, 1220 (6th Cir. 1997).   Second, the Court finds the remainder of Clark's conclusions from sections nine and ten are not supported by reliable methodology.   Although Clark utilized tools such as domain name reports, Google Trends, and a website history tool, waybackmachine.com, he fails to demonstrate that this information goes beyond the knowledge or experience of laymen.   The Court, accordingly, **grants** LMI's motion to exclude Clark's testimony.

## B. Dr. John Peloza's Expert Opinion

LMI's second motion in limine seeks to exclude from evidence the testimony, reports, and conclusions of JC's expert, John Peloza, Ph.D. ("Dr. Peloza"). (DN 31-1).   LMI argues that Dr. Peloza's survey methodology is flawed and, as such, his data and conclusions are unreliable. (Id. at p. 4).   Relying on its rebuttal expert, Krista F. Holt, LMI believes Dr. Peloza asked the wrong questions to the wrong people.   (Id. at pp. 4-5).

Dr. Peloza based his first expert report on two "consumer surveys" that he conducted. (DN 31-2, at pp. 4-15).   The admissibility of survey evidence is also governed by FRE 702 and Daubert.   Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 777 (W.D. Mich. 2006).   Consumer surveys are commonly admissible in trademark actions and may provide strong evidence on issues of secondary meaning, likelihood of confusion, and genericness.   Id. (collecting cases).

11

Because almost all surveys are subject to some sort of criticism, courts generally hold that technical and methodological deficiencies in a survey relate to the weight to be given to the survey, not its admissibility. Id.; *see also* Hodgdon Powder Co. Inc. v. Alliant Techsystems, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (citing Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 523 (10th Cir. 1987)).  Yet an exception exists when a survey's deficiencies cumulatively undermine its relevance and reliability.  Malletier v. Dooney & Bourke, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007).  If the survey's deficiencies are "so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence."  Hogdon Powder Co. Inc., 512 F. Supp. 2d at 1181 (quoting Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1466 (D. Kan. 1996)).

To determine the trustworthiness of a survey, the court considers a variety of factors, including whether:

> (1) the "universe" was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles; and (7) objectivity of the process was assured.

Leelanau Wine Cellars, Ltd., 452 F. Supp. 2d at 778 (quoting Consumers Union of United States, Inc. v. New Regina Corp., 664 F. Supp. 753, 769 n. 19 (S.D.N.Y. 1987)); *see also* Manual for Complex Litigation (Fourth) § 11.493 (2004).

LMI's argument for excluding Dr. Peloza's opinion is two-fold.  First, LMI believes Dr. Peloza failed to identify an appropriate target population for his surveys. (DN 31-1, at pp. 11).  Second, LMI feels Dr. Peloza's inquiries and methodology were flawed. (Id.).

12

1. Target Population of Surveys

LMI takes issue with Dr. Peloza's survey "universe" by arguing that his survey population was both too broad, in that "he made no effort to define a target population at all," and too small, in that the "limited number of respondents defeats his surveys' statistical significance." (Id. at pp. 12-13).   Citing its rebuttal report from Krista F. Holt, LMI contends that Dr. Peloza's survey populations "are grossly inconsistent with the typical candle buyer" because according to the National Candle Association, "around 90% of the candles sold in the U.S. were bought by women."  Id. at p. 12 (citing Holt Report pp. 10-11).

JC counters that because it markets its products to the general public, the general public is the appropriate survey universe.  (DN 49, at p. 8).   JC cites to numerous cases "involving genericness" where much broader universes were approved by courts. (Id. at p. 9).   Even if its survey universe is flawed to an extent, JC argues the deficiencies should go to the weight afforded to the survey rather than its admissibility.   (Id. at p. 12).

Selection of the proper universe is a "critical element" in assessing the validity of a survey as well as the weight it should receive. Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003). LMI relies on cases with surveys measuring "likelihood of confusion" where the courts have found that the proper universe is the potential purchasers of the junior user's goods or services.   See Schieffelin & Co. v. Jack Co. of Boca, Inc., 850 F. Supp. 232 (S.D.N.Y. 1994) (finding universe of "persons between the legal drinking age and the age of 64" was too broad for potential customers of Dom Perignon champagne); Weight Watchers Intn'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259 (S.D.N.Y. 1990) (finding that universe of "women between the ages of 18 and 35 who have purchased frozen food entrees in the past six months and tried to

lose weight through diet and/or exercise in the past year" was not properly limited for customers of frozen diet entrees).   Whereas, JC relies on cases with surveys evaluating "genericness," where the target universe is "consumers who have purchased or are likely to purchase the product at issue."   Nightlight Systems, Inc. v. Nitelites Franchise Systems, Inc., No. 1:04-CV-2112-CAP, 2007 WL 4563873, at *6 (N.D. Ga. July 17, 2007) (finding that universe of past purchasers of low voltage illumination systems for $300,000 residential homes was sufficiently defined); Invisible Fence, Inc. v. Fido's Fence, Inc., No. 3:09-CV-25, 2013 WL 6191634, at *4 (E.D. Tenn. Nov. 26, 2013) (finding universe of "persons who owned their home and had a dog as a pet" was appropriate in genericness survey).

Here, the universe Dr. Peloza used for his two surveys was comprised of "workers" from an academic research service, Mechanical Turk, which ensures "generalizability within a broad population." (DN 31-2, at p. 4).  Dr. Peloza's report states that because the product category in question is typically purchased online, the online environment is appropriate for survey data collection.  (Id. at p. 5).   For the first survey, 56% of respondents were males, while 44% were females, and the average age of respondent was 33.91 years (ranging from 19 to 67).  (Id. at p. 7).  Dr. Peloza also considered a subset of the universe, those respondents who reported an intention to purchase scented candles/wax tarts in the next twelve months.  (Id. at p. 8).

Whether Dr. Peloza's surveys were intended to measure "likelihood of confusion" or "genericness" is of little consequence in assessing his survey universes because either way Dr. Peloza's survey universes are overly broad.   Although Dr. Peloza identified a subset of respondents who reported a future intent to purchase scented candles or wax tarts, the subset came from his survey of the "general public."  Dr. Peloza performed no screening to target LMI's

14

primary customers, and the universe without a doubt included persons who are not potential customers of LMI's candles.   By failing to more specifically tailor the target universe, Dr. Peloza diminished the reliability of his surveys.   *See* Competitive Edge, Inc. v. Staples, Inc., 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010).   Accordingly, the Court must consider this flaw in determining whether Dr. Peloza's surveys are admissible.

As to the sufficiency of Dr. Peloza's sample size, there is no magic number as to how many respondents a survey must poll in order to make it "statistically significant."   In AutoZone, Inc. v. Tandy Corp., the court found that 110 respondents to a survey was a questionably small number. 373 F.3d 786, 799 n. 2 (6th Cir. 2004).   Similarly, in Powerhouse Marks LLC v. Chi Hsin Impex, Inc., the court determined that 150 respondents was a "small pool."   No. 04-73923, 2006 WL 20523, at *6 (E.D. Mich. Jan. 4, 2006).   Here, 199 respondents completed Dr. Peloza's first survey and 292 completed his second.     (DN 31-2, at pp. 6, 13).   While these sample numbers are slightly larger than those in AutoZone or Powerhouse Marks, 199 and 292 might still be too small of a sample to represent the universe of potential customers of LMI's products, distributed nationwide via the internet.   As such, the sample number should also be considered in the Court's cumulative assessment of admissibility.

### 2. Survey Methodology and Questions

LMI also argues that Dr. Peloza's surveys fail to follow "any of the protocols for the generally accepted genericness or secondary meaning surveys commonly utilized[.]" (DN 31-1, at p. 14).   LMI asserts that surveys which merely test for consumer awareness of a particular designation are irrelevant. (Id. at p. 15).   In summary, LMI believes that Dr. Peloza simply

15

established a random, limited set of individuals, not identified as consumers or potential consumers of the product in question, that have limited awareness of the product category.   (Id.).

JC counters that Dr. Peloza's survey methods, a "Statement of Meaning Survey" that is consistent with Sixth Circuit law regarding suggestiveness and the widely accepted "Thermos" test for genericness, were appropriate. (DN 49, at p. 17).    JC notes that Dr. Peloza's surveys were not based on consumer *awareness* but on consumer *understanding* and the "survey designs, questions, and methodologies were fully disclosed."   (Id. at p. 18).

In the first survey, Dr. Peloza asked several questions "to capture an unbiased response for consumer perceptions of the product category," including (1) describe a "jewelry candle;" (2) history and intentions for purchasing scented candles or wax tarts; and (3) awareness of candles or wax tarts containing hidden pieces of jewelry inside. (Id. at pp. 5-6).   Dr. Peloza found that 32% of respondents in the overall sample described a "jewelry candle" as a candle that contained a piece of jewelry, whereas 68% of the sample described "jewelry candle" differently or could not describe such a product. (Id. at pp. 7-8).   Dr. Peloza then evaluated a subset of the sample, those who reported an intention to purchase scented candles or wax tarts in the next twelve months, which revealed similar results as to the conception of a jewelry candle. (Id. at p. 8).   Dr. Peloza concluded from consumer survey one that in early 2013, the term "jewelry candles" had very little meaning for the vast majority of consumers. (Id. at p. 13).

The purpose of Dr. Peloza's second survey was to "directly measure consumers' awareness of the product both today" and, if applicable, when they first became aware of the product. (DN 31-2, at p. 13).   The questions in the second survey differed from the first; if consumers answered "yes" that they were aware of candles or wax tarts with jewelry hidden inside, they were required

to state the year they became aware of that product from a range of 2008 to 2016 or to answer "I don't know." (Id. at pp. 13-14).   Dr. Peloza analyzed that 33% of respondents reported awareness of the product category, which validated his findings from survey one. (Id. at p. 14).   Dr. Peloza determined that survey two's results suggest that the product category consisting of scented candles or wax tarts with hidden pieces of jewelry inside is very new to consumers.   (Id. at p. 16).

Surveys in trademark cases may be considered "so long as they are conducted according to accepted principles."   Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832 (9th Cir. 2001).   Although the Thermos and Teflon models of surveys to test for genericness are "preferred," depending on the circumstances, "other survey formats can also be relevant to the issue of trademark significance."   McCarthy § 12:14 (2016).   A Thermos survey generally describes the product and asks respondents how they would ask for a product in the store. Nightlight Systems, 2007 WL 4563873, at *1 (citing McCarthy § 12:15).   While a Teflon survey first establishes whether the respondent grasps the distinction between common names and brand names, and then asks the respondent to categorize a number of terms as common or brand, including the terms at issue.   E.T. Browne Drug Co. v. Cococare Prods., Inc. 538 F.3d 185, 195 (3d Cir. 2008).

The Court finds that neither of Dr. Peloza's first two surveys followed the Thermos model. Dr. Peloza did not generally describe the product and did not ask respondents how they would ask for the product in a store.   Rather, Dr. Peloza asked respondents in survey one to "describe a jewelry candle."   Given that Dr. Peloza's survey was not designed to elicit a brand name, it does not satisfy the objectives of the Thermos genericness model.   Neither do Dr. Peloza's first two surveys follow the Teflon model.   Dr. Peloza did not ask respondents to categorize any terms as

17

common or brand.   However, it is not dispositive that Dr. Peloza's first two surveys do not perfectly match either the Thermos or Teflon model for genericness surveys.

Dr. Peloza's first two surveys, instead, sought to measure consumer's perception and awareness of the product category at issue in the case.   LMI cites to Invisible Fences for the proposition that surveys testing merely for "consumer awareness of the designation [are] irrelevant."   (DN 31-1, at p. 15 (citing Invisible Fences, Inc. v. Fido's Fences, Inc., No. 3:09-CV-025, 2014 WL 558672, at *10 (E.D. Tenn. Feb. 11, 2014) (quoting McCarthy § 12:14)). Yet the court in Invisible Fences found the consumer awareness study should not be excluded as irrelevant but should be tested through cross-examination, contrary evidence, and argument. 2014 558672, at *10.   Similarly, the Ninth Circuit in Stuhlbarg determined that although the consumer survey left out a critical issue involving genericness and no information was provided as to the survey design, questions, and methodology, it was appropriate for the district court to admit the survey and ascribe it little weight.   240 F.3d at 840.   While consumer awareness surveys like those discussed in Invisible Fences and Stuhlbarg are not the preferred genericness surveys identified by the McCarthy treatise, the Court finds Dr. Peloza's surveys were conducted according to accepted principles and should not be excluded on this basis.

### 3. To Admit or to Exclude?

Having identified flaws in Dr. Peloza's surveys, the Court must determine whether the flaws merely go to the weight of the evidence, or whether the flaws are so substantial that the survey is unreliable and/or irrelevant and should therefore be excluded.   *See* Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 787 (W.D. Mich. 2006). The Court concludes that despite Dr. Peloza's failure to properly tailor the survey universes or use the

preferred models for genericness surveys, the survey's deficiencies are not so substantial as to render Dr. Peloza's conclusions untrustworthy.   The Court finds the better course is to admit the survey so that the District Court may consider this flaw in assigning weight to the trademark infringement analysis.   As such, the Court **denies** LMI's motion to exclude Dr. Peloza's original report (DN 31).

### C. John Peloza's "Rebuttal Opinion"

LMI also objects to Dr. Peloza's "rebuttal opinion," (DN 31-3) arguing it should be stricken because it goes far beyond the scope and subject matter of the reports it purports to rebut. (DN 33-1, at p. 7).   Because the so-called rebuttal report is actually a supplementation and expansion of Dr. Peloza's original report, LMI asserts it constitutes an untimely submission of a primary expert report.   (Id. at p. 9).   If the Court disagrees and permits Dr. Peloza's "rebuttal opinion," LMI seeks the opportunity to rebut his opinion. (Id.).

JC counters that its "rebuttal" report from Dr. Peloza was timely filed both within the original time frame for its initial expert disclosures *and* within Fed. R. Civ. P. 26(a)(2)(D)(ii)'s 30-day period for rebuttal reports.   (DN 49, at p. 18).   JC explains that Dr. Peloza's rebuttal report does not exceed the scope of an expert rebuttal under Rule 26(a)(2)(D)(ii) but, rather, addresses the same subject matter as LMI's expert witnesses. (Id. at p. 21).

A brief review of the timeline for the parties' submission of expert reports is warranted. The original scheduling order of the case, entered May 20, 2015, specified that Plaintiff's (LMI's) expert reports shall be completed "no later than January 15, 2016" and Defendant's (JC's) expert reports shall be completed   "no later than February 15, 2016." (DN 12).   The parties extensively debated the expert disclosures and deadlines in a telephonic conference on February 1, 2016,

however, no agreement could be reached, and the Court ordered "the deadlines for expert disclosures remain the same as set forth in the previously entered scheduling order (DN 12)." (DN 28).

On January 15, 2016, JC submitted an expert report from Dr. Peloza and LMI submitted expert reports from Thomas W. Stewart, Ph.D., John D. Morris, Ph.D., and Brad Howard. (DN 31-2; DN 33-3 at pp. 5-22).   On February 16, 2016,[1] LMI filed a rebuttal report from Krista F. Holt to address Dr. Peloza's initial report. (DN 31-4). On the same day, JC submitted a second expert opinion from Dr. Peloza, titled a "rebuttal report," which responds to particular points in the expert witness reports of Dr. Stewart, Dr. Morris, and Brad Howard (DN 31-3).

As an initial matter, the Court will not exclude Dr. Peloza's expert report based on LMI's timeliness arguments.   The record reflects that JC was permitted to file initial expert reports before February 16, 2016, so even if Dr. Peloza's second report exceeds the scope of a rebuttal report, it can still be considered timely filed as an initial expert disclosure.

### 1. Scope of Dr. Peloza's Report

The Court must examine the subject matter of Dr. Peloza's second report to determine whether it is an initial report or a rebuttal report.   If Dr. Peloza's second report functions as an initial report, then LMI seeks opportunity to rebut the opinion.

Rule 26(a)(2)(D)(ii) provides that rebuttal disclosures are those that relate to evidence that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party" in its expert disclosure.   Courts vary as to the proper scope of expert rebuttal testimony but generally do not permit a rebuttal report to extend beyond the scope of the other party's expert reports.   *See* Hans v. Tharaldson, No. 3:05-cv-115, 2011 WL 6937598, at *10 (D.N.D. Dec. 23,

---

1 Because February 15, 2016, fell on a Sunday, the parties agreed to extend the deadline to February 16, 2016.   (DN

2011); Duff v. Duff, No. 04-345-KSF, 2005 WL 6011250, at *4-5 (E.D. Ky. Nov. 14, 2005); Poly-America, Inc. v. Serrot Intn'l, Inc., No. CIV.A. 300CV1457D, 2002 WL 1996561, at *15 (N.D. Tex. Aug. 26, 2002).

The objective of Dr. Peloza's "rebuttal" report was to respond to particular points in the expert reports of Dr. Stewart, Dr. Morris, and Brad Howard.  (DN 31-3, at p. 3).  Dr. Stewart's report outlines the established tests for determining (or refuting) the genericity of a given noun phrase expression and applies the test to the target expressions "jewelry in candles" and "jewelry candles."  (DN 33-1, at pp. 3-4).  Dr. Stewart concluded that both "jewelry in candles" and "jewelry candles" have the potential to serve as generic terms for the product-type in question based on testable linguistic criteria.  (Id. at p. 4).  LMI enlisted Dr. Morris to determine whether the two logos at issue in the case are confusing in the marketplace from a consumer's perspective.  (Id. at pp. 4-5).  Dr. Morris noted that there is nothing similar about the two logos, except the words "jewelry" and "candles," which are generic and descriptive.[2]  (Id. at p. 5).

In response to Dr. Stewart's report, JC asked Dr. Peloza to assess and estimate whether, from the perspective of the consuming public in early 2013 and subsequent years, the phrases "jewelry in candles" and "jewelry candle(s)" were generic terms referring to candle products containing hidden items of jewelry.  (DN 31-3, at p. 4).   For Dr. Morris's report, Dr. Peloza was to conduct the same survey and analyses as for Dr. Stewart's report, but only with respect to the phrase "jewelry in candles."  (Id.).   Based on two additional surveys, one to survey consumers' understanding of the phrase "jewelry in candles," and the other a variant of the "so-called *Thermos*

---

2 In a contemporaneous order addressing JC's motion in limine (DN 36), the Court determines that Dr. Morris's opinion should be excluded because his conclusions did not require any specialized knowledge, skill, or experience.

test for genericness" regarding the phrases "jewelry candle(s)" and "jewelry in candles," Dr. Peloza found the terms were not generic.   (DN 31-3, at p. 3).

The Court finds that Dr. Peloza's second report addresses the same subject matter as Dr. Stewart and Dr. Morris-namely, whether "jewelry in candles" and "jewelry candles" are generic terms.   Dr. Peloza's conclusion that neither term is a "generic reference used by consumers to describe a specific product" provides a counterpoint for LMI's expert reports indicating the terms and logos were generic.

The Court, however, believes that portions of Dr. Peloza's report may exceed the scope of simply responding to LMI's experts.   Specifically, the Court takes issue with Dr. Peloza's conclusions as to Google Trends Reporting and Online Data Collection as a means of challenging Dr. Stewart/Dr. Morris's analysis.   *See* E.E.O.C. v. Tepro, Inc., 133 F.Supp. 3d 1034, 1047 (E.D. Tenn. 2015).   *See* Alvarado v. Oakland County, 809 F. Supp. 2d 680, 688 (E.D. Mich. 2011). Nonetheless, the Court finds exclusion of the entire rebuttal is unnecessary on this basis because he is a qualified rebuttal expert and any matters regarding the potentially excessive scope of his rebuttal testimony can be challenged through objections and rigorous cross-examination.

LMI also used Brad Howard as an expert to opine as to whether the two competing logos were similar.   Like Dr. Morris, Howard discussed the lack of similarly between the logos from a design standpoint.   Howard concluded that a person walking down the street seeing the two logos next to each other would have "zero chance" of confusing them as the same business.   (Id.).   In substance, Dr. Peloza's report consists of a critique of Howard's report.   Dr. Peloza identifies three flaws in Howard's assessment and proffers evidence refuting Howard's conclusions.   After

reviewing both reports, the Court concludes that Dr. Peloza's report as to Dr. Howard's opinion is indeed an appropriate rebuttal.

### 2. Should the Rebuttal Report be Excluded?

LMI makes the same arguments for the exclusion of Dr. Peloza's rebuttal report as it made for his initial report – that the survey universe and methodology were flawed.  (DN 31-1, at pp. 6-7, 12-15).   In Dr. Peloza's "rebuttal" report, he conducted two additional surveys, one to survey consumers' understanding of the phrase "jewelry in candles," and the other a variant of the "so-called *Thermos* test for genericness" regarding the phrases "jewelry candle(s)" and "jewelry in candles." (DN 31-3, at p. 3).   Like his first two surveys, Dr. Peloza's third and fourth surveys utilized the "Mechanical Turk" service from Amazon to find anonymous respondents from the online environment.   (Id. at p. 9).   The third survey asked respondents to describe a product referred to as "jewelry in candles" and then asked directly if they were aware of candles/wax tarts containing hidden pieces of jewelry inside of them. (Id.).   As determined above, although Dr. Peloza's third survey suffers from the same universe and methodology issues as the first two surveys, the Court will admit the survey to allow the district court to consider these flaws in assigning the survey weight.

In Dr. Peloza's fourth survey, 237 respondents from the Mechanical Turk service were asked "screener" questions to determine the universe of consumers who have purchased or will purchase scented candles or wax tarts. (Id. at pp. 15-16).   After the screening questions, respondents were introduced to the product and asked the *Thermos* questions: "If you were going to buy a candle with hidden jewelry inside, what would you ask for?" and "Can you name any companies that sell candles with hidden jewelry inside?"   (Id. at p. 69).   Because Dr. Peloza's

23

fourth survey differs slightly from his prior three surveys, in that he utilized a version of the preferred "Thermos" method, LMI's argument against his methodology is not persuasive.   Yet any flaws in the fourth survey, including the survey's overbroad universe, can still bear on the weight the survey should receive from the District Court.

To summarize, Dr. Peloza's second report, submitted on February 16, 2016, will be considered an admissible rebuttal report as to the initial reports of Dr. Stewart, Dr. Morris, and Brad Howard except for Dr. Peloza's ultimate conclusions as to genericness.

ORDER

**IT IS HEREBY ORDERED** that LMI's Motion in Limine to exclude Scott Clark's expert report (DN 30) is **GRANTED**.

**IT IS FURTHER ORDERED** that LMI's Motion in Limine to exclude Dr. John Peloza's expert report (DN 31) and Motion to Strike Dr. John Peloza's rebuttal report (DN 33) are **DENIED**.

Copies:        Counsel of Record

24