UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00084-DJH

**LOUISVILLE MARKETING, INC.**                                **Plaintiff/**
**d/b/a as JEWELRY IN CANDLES**                    **Counterclaim Defendant**

**v.**

**JEWELRY CANDLES, LLC**                                            **Defendant/**
                                                                                       **Counterclaimant**

**v.**

**P. MICAH BUSE**                                                   **Third-Party Defendant**

<u>**MEMORANDUM, OPINION,**
**AND ORDER**</u>

      Jewelry Candles, LLC, has filed a motion in limine to exclude the expert witness testimony of Jon Morris, Brad Howard, and Krista Holt. (DN 36).   Louisville Marketing Inc., doing business as Jewelry in Candles, (collectively referred to herein as "LMI") has filed a response (DN 47), and JC has filed a reply (DN 58).   This matter is ripe for ruling.

I. Background

      Around July of 2012, Osagie Enaiho ("Enaiho") was operating an online business named Jewelry Candles ("JC"), which sells candles and wax tarts that contain concealed jewelry items. (DN 6, at p. 6).   Enaiho operated his business as a sole proprietor until about April 30, 2013, when he formed Jewelry Candles, LLC, as a Delaware limited liability company where he served as the sole member and owner. (<u>Id.</u>)   Over a month later, JC applied for federal registration of a composite word mark stating "Jewelry JC Candles A Hidden Jewel Inside Every Candle," which

the USPTO granted.  (Id. at pp. 7-8).  JC has also applied for federal registration of "Jewelry Candles" and "Jewelry Candle" as word marks, but these applications remain pending before the USPTO.  (Id.).

In January of 2013, Enaiho contacted Louisville Marketing, Inc. ("LMI") through LMI's website seeking information about search engine optimization ("SEO") and search engine marketing ("SEM") services and graphic design services. (Id. at p. 9).   LMI's owner, Paul Micah Buse ("Buse"), responded to Enaiho's request, and asked for analytic reports and non-public analytics about JC's website. (Id.).   Enaiho and Buse continued to communicate through e-mail for several days, discussing JC's business and efforts to protect its intellectual property. Specifically, Buse indicated in an e-mail to Enaiho that he needed to secure his brand by trademarking his product and idea before someone could steal it.   (Id. at p. 10).   On the same day Buse sent that e-mail, and unbeknownst to Enaiho, Buse registered the domain jewelryincandles.com.  (Id.).   Several days later, Buse and Enaiho met in person, and Buse disclosed he had no interest in LMI providing marketing services to JC, but, rather, Buse wanted to become partners with Enaiho and obtain an equity stake in JC.  (Id. at p. 11).   Enaiho declined Buse's offer. (Id.).

A few weeks later, LMI applied to assume the name "Jewelry in Candles" in Kentucky and filed the application with the Kentucky Secretary of State. (Id. at p. 11).   JC believes LMI launched a competing online business around May 4, 2013, selling candles containing jewelry items under the trade name "Jewelry in Candles."   As a result, JC filed a WIPO Complaint on January 5, 2014, initiating proceedings requesting the transfer of LMI's jewelryincandles.com domain name and alleging that LMI is infringing on its trademark rights.

2

LMI filed its Complaint with this Court on January 23, 2015, seeking a declaratory judgment that the term "Jewelry in Candles" is a generic term for candle products with jewelry in them, and, as such, LMI is not infringing on JC's styled design mark by making, using, selling, and offering to sell its candles with jewelry inside of them (DN 1, at pp. 6-7).   JC filed an answer and counterclaim, alleging trademark infringement, unfair competition and false designation of origin, unfair competition in Kentucky, and requesting injunctive relief (DN 6).

## II. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the  evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny,   <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court charged trial courts with acting as

"gatekeepers" to ensure expert testimony admitted pursuant to FRE 702 is relevant and reliable. Daubert also identified a list of non-exhaustive factors to assess reliability, including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance: in the "relevant scientific community." 509 U.S. at 593-94. Daubert's gatekeeping obligation applies not only to "scientific" testimony, but to all expert testimony. Shepherd v. Unumprovident Corp., 381 F. Supp. 2d 608, 610 (E.D. Ky. 2005).

No matter how good an expert's credentials may be, his opinion must be "supported by more than subjective belief and unsupported speculation." McLean v. Ontario, Ltd., 224 F.3d 797, 800-01 (6th Cir. 2000) (citation omitted); *see also* Tamraz v. Lincoln Elec., Co., 620 F.3d 665, 671-72 (2010). When the subject matter of an expert's testimony is "within the knowledge or experience of laymen," the testimony is superfluous. Bartak v. Bell-Galyardt & Wells, Inc., 629 F.2d 523, 530 (8th Cir. 1980) (citing Bridger v. Union Ry., 355 F.2d 382, 387 (6th Cir. 1966)).

### III. Analysis

### 1. Dr. Morris

JC argues that Dr. Morris's report suffers from three flaws: (1) Dr. Morris analyzed an incorrect version of Jewelry in Candles' logo; (2) Dr. Morris's opinions run contrary to Sixth Circuit law on the issue of likelihood on confusion; and (3) Dr. Morris gave opinions as to legal terms of art. (DN 36, at pp. 7-8).

The Court will initially address JC's second argument, which states that Dr. Morris's opinions run afoul to Sixth Circuit law on the issue of likelihood of confusion. Because Dr.

4

Morris did not attempt to test or consider the views of the consuming public, JC believes his testimony lacks an evidentiary foundation and should be excluded. (DN 36, at p. 7).   LMI responds that Dr. Morris should be able to testify on likelihood of confusion because he has personal knowledge and experience in the marketing industry. (DN 47, at p. 12).   LMI primarily relies on Betterbox Communs., Ltd. v. BB Techs., Inc., 300 F.3d 325, 328, 329 (3d Cir. 2002)), where a divided Third Circuit panel found that although the expert's testimony as to likelihood of confusion was based on "personal knowledge or experience," as opposed to a methodology satisfying the *Daubert* factors, the testimony was admissible because it tracked "many" of the factors for testing likelihood of confusion.   237 F.3d at 215.

In the Sixth Circuit, the question of whether there is a likelihood of confusion is "a mixed question of fact and law."   Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1107 (6th Cir. 1991).   The further question of whether a given set of foundational facts establishes a likelihood of confusion, however, is a "legal conclusion."   Id. (citing Wynn Oil v. Thomas, 830 F.2d 1183, 1186 (6th Cir. 1988)).

This Circuit balances the following factors when evaluating likelihood of confusion: (1) strength of the senior mark; (2) similarity of the marks; (3) relatedness of the goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir. 1982). These factors imply no mathematical precision, and not all factors will be particularly helpful in any given case.   Homeowners Group, Inc., 931 F.2d at 1107.   The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are

affiliated in some way."   Id.; *see also* Maker's Mark Distillery, Inc. v. Diageo North Amer., Inc., 703 F. Supp. 2d 671, 690 (W.D. Ky. 2010).

The prevailing method for introducing evidence on the issue of likelihood of confusion is through consumer surveys.   *See* Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:158 (4th ed. 2013); Patsy's Italian Rest., Inc. v. Banas, 531 F. Supp. 2d 483, 485 (E.D.N.Y. 2008).   Although a consumer survey is not necessary to prove likelihood of confusion exists, a lack of survey evidence weighs against any finding of actual confusion between the parties' marks.   Patsy's Italian Rest., Inc., 531 F. Supp. 2d at 485 (citing Merriam-Webster v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994)).

Here, Dr. Morris did not rely on consumer survey evidence in opining that the only similarity between the logos of JC and LMI are the words "jewelry" and "candles."   (DN 37-4, at p. 2).   Rather, Dr. Morris drew these conclusions based on his personal knowledge and expertise in the marketing and advertising industry.   Numerous courts have found that a personal opinion offered by an expert as to likelihood of confusion, without survey evidence, should be excluded because it usurps the jury's role in making factual determinations. Flagstar Bank FSB v. Freestar Bank, N.A., 687 F. Supp. 2d 811, 821 (C.D. Ill. 2009) (jury does not need assistance in comparing similarities and differences of common English words but needs help in determining how the similarities of words lead to confusion or how differences negate confusion); JIPC Management, Inc. v. Incredible Pizza Co., Inc., 2009 WL 8591607, at *4 (C.D. Cal. July 14, 2009) (excluding personal opinion of expert because expert should not opine "on the ultimate likelihood of confusion between the parties' marks."); Patsy's Italian Rest., Inc., 531 F. Supp. 2d at 485.

6

Dr. Morris's opinion would not be helpful to the jury because it is primarily based on his personal observations regarding the similarities between the marks and does not rely on specialized knowledge.  He simply compared two logos, noting the logos each use the words "jewelry" and "candles," a conclusion the common juror does not need assistance in making.  *See* Flagstar Bank FSB, 687 F. Supp. 2d at 821.  Similarly, Dr. Morris's conclusion that several companies market similar products with "candles and jewelry as part of the same vessel" on the internet does not provide any real assistance to the trier of fact.

As for LMI's reliance on Betterbox, the Court finds the present case distinguishable.   In Betterbox, the expert based his testimony on personal knowledge and experience and considered a number of factors for evaluating likelihood of confusion in his analysis.   The Third Circuit found that even if the district court erred in admitting the expert's testimony under these circumstances, the error was harmless.   300 F.3d at 329.    In this case, Dr. Morris's opinion does not appear to track the likelihood of confusion factors from Frisch's Rests., Inc., 670 F.2d at 648.   It also seems Dr. Morris only used his experience in marketing and advertising, along with a simple Google search to draw his conclusions, whereas, the expert in Betterbox "examined the companies's [sic] catalogs," "informally surveyed colleagues," and "evaluated the catalogs' target market."   300 F.3d at 329.    LMI's reliance on Betterbox, accordingly, is not persuasive.

Because the evidence in Dr. Morris's report does not require any special knowledge, skill, or experience to interpret and the jury is fully capable of understanding the same evidence and making its own determination regarding similarity between the marks, Dr. Morris's opinion is properly excluded.[1]   JC's motion in limine is, therefore, **GRANTED** as to Dr. Morris's opinion.

---

1  It is not necessary to address JC's additional arguments for exclusion of Dr. Morris's testimony.

7

2. Brad Howard

JC also identifies numerous flaws in Brad Howard's ("Mr. Howard") report that it believes warrant exclusion.   JC first takes issue with Mr. Howard's unsupported speculation regarding the kind of designer that likely created each logo and what goals these unknown designers had in mind.   (DN 36, at p. 9).   JC also feels that Howard's report, like Dr. Morris's report, did not consider the views of the consuming public and provides no evidentiary foundation to suggest that he is a relevant consumer for these purposes.   (DN 36, at p. 10).   Finally, JC argues that Mr. Howard's report violates the "anti-dissection rule" of trademark law and improperly expresses an "ultimate conclusion" that there is zero chance a side by side comparison of the two marks would lead to confusion. (Id. at p. 11 (citing AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 795 (6th Cir. 2004)).

As a preliminary matter, the Court agrees that Mr. Howard's opinions that Logo 1 "looks to have been created by someone without professional training and without much thought to the goal of the logo" and that Logo 2 "looks to have been created by a professional designer or agency with extensive knowledge in creating logos with graphic elements that help customers identify what they sell or make" are based improper speculation and are largely irrelevant.

Turning to JC's second argument for excluding Howard's opinion, the Court notes its above analysis on expert opinions in evaluating likelihood of confusion to be instructive.   Mr. Howard based his opinion on his personal experience as a professional graphic designer rather than on consumer survey evidence.   While the lack of survey evidence weighs against admitting Mr. Howard's report, the Court must still determine whether Mr. Howard's opinion interferes with the jury's role in making factual determinations.   Mr. Howard's report contains evidence less

8

intuitive than that in Dr. Morris's report.   For instance, Mr. Howard discusses how LMI's logo utilizes purchased fonts or custom script that project elegance and inspire a feeling of being "Home." (DN 37-5, at p. 5).   Particular fonts and graphic elements within a logo qualify as specialized knowledge, that common jurors may need assistance in evaluating.   To that end, the Court will not exclude Howard's opinion on this basis.

JC's last argument for excluding Mr. Howard's report focuses on his violation of the "anti-dissection rule" and his ultimate conclusion that "if a person were walking down the street and saw these two logos sitting next to each other, there is zero chance that they could be confused for the same business."   (DN 36 (citing DN 37-5, at p. 6)).   In assessing the similarity of marks, the Sixth Circuit endorses the "anti-dissection rule," which serves to remind courts that marks should be viewed in their entirety and should focus on their overall impressions, not individual features.   AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 795 (6th Cir. 2004); Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 423 (6th Cir. 1999).   However, it is not a violation of the anti-dissection rule to "separately view the component parts as a preliminary step on the way to an ultimate determination of probable customer reaction to the composite as a whole."   Midwest Guaranty Bank v. Guaranty Bank, 270 F. Supp. 2d 900, 910 n. 6 (E.D. Mich. 2003) (quoting McCarthy § 11:27 (4th ed. 2002)).

JC's attempt to broaden the scope of the anti-dissection rule by citing to AutoZone, Inc. is not compelling.   In AutoZone, Inc., the Sixth Circuit found it was a violation of the anti-dissection rule to delete the common word in the marks, which was "ZONE," and consider the similarity between only "AUTO" and "POWER."   373 F.3d at 795.   No such dissection occurred here. While Mr. Howard did break down the two logos, he discussed the fonts and graphic elements of

each logo as a preliminary step before determining that no likelihood of confusion exists between the two marks.   Mr. Howard's opinion does not violate the anti-dissection rule.

JC's final effort at excluding Howard's testimony focuses on Mr. Howard's "ultimate conclusion that:

> As a professional graphic designer for almost 20 years that has produced countless logos and branding strategies. [sic] It is in my honest and professional opinion that if a person were walking down the street and saw these two logos sitting next to each other, there is zero chance that they could be confused for the same business.

(DN 37-5, at p. 6).

An expert's opinion may embrace an ultimate issue to be decided by the trier of fact so long as the issue embraced is a factual one.   As explained above, "[w]hether there is a likelihood of confusion is a mixed question of fact and law, but the determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion."   Homeowners Group v. Home Marketing Specialists, 931 F.2d 1100, 1106-07 (6th Cir. 1991).   Put otherwise, "the determination of what is the state of affairs regarding each factor is a finding of fact[,]" but "the further determination of likelihood of confusion based on those factors is a legal conclusion." Induct-O-Matic Corp. v. Inductotherm Corp., 747 F.2d 358, 361 (6th Cir. 1984).   Mr. Howard's determination that no likelihood of confusion exists between the marks is a legal conclusion because it supplies the jury with no information other than the witness's view of how the verdict should read.   The Court therefore, will exclude Mr. Howard's legal conclusion as to likelihood of confusion, but his opinions on the individual foundational facts remain admissible and can be considered.

10

3. Krista Holt

JC's motion in limine also challenges the testimony of LMI's rebuttal witness, Krista F. Holt. (DN 36, at p. 11).   JC argues Holt's report should be excluded because she: (1) is an "expert for hire;" (2) opines as to legal conclusions; (3) determines the only relevant legal issues are genericness and secondary meaning; and (4) subjectively advocates for the proper survey universe in the case. (Id. at pp. 11-23).

First, JC contends Ms. Holt is a "quintessential expert for hire" because her report reads as a legal brief and introduces legal conclusions in the guise of expert testimony.   (DN 36, at p. 13). LMI responds that a paid expert should be subject to scrutiny only when his or her testimony derives from a theory or methodology created solely for purposes of litigation.   (DN 47, at p. 7).

Courts draw a distinction between "experts for hire" and experts who testify as to matters growing naturally and directly out of their research.   Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 435 (6th Cir. 2007).   When a purported expert's opinion is prepared solely for litigation or when the expert spends the majority of their time testifying in trials, that fact may be considered as a basis for exclusion.   Banks v. Bosch Rexroth Corp., No. 5:12-345-DCR, 2014 WL 1364763, at *3 (E.D. Ky. Apr. 7, 2014) (citing Newell v. Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012)).   If the expert is found to be a "quintessential expert for hire," the party offering the expert must show support regarding the expert's familiarity with the subject in question.   Johnson, 484 F.3d at 434.

While Ms. Holt's report was prepared solely for litigation and Ms. Holt has testified as an expert in at least ten trials over the past five years, she does not appear to be the type of "quintessential expert for hire" that typically raises suspicion.   Beyond providing expert

11

testimony in trials, Ms. Holt's CV indicates she is well-credentialed and has spent years performing consulting work regarding intellectual property.  Ms. Holt has also published a number of scholarly articles addressing legal issues involving patents and trademarks. (DN 37-6, at p. 26).

While the fact that Ms. Holt's report was prepared solely for litigation "does raise a question regarding its reliability, that fact is not dispositive."  Banks, 2014 WL 1364763, at *4 (citing Hayes v. MTD Products, Inc., 518 F. Supp. 2d 898, 900-01 (W.D. Ky. 2007)).   The Court finds that because Ms. Holt has sufficient experience relating to trademarks and intellectual property law, her rebuttal report should not be excluded on this ground.  JC may nevertheless raise this issue during cross-examination.

JC also argues Ms. Holt's testimony should be excluded because she "introduces legal conclusions in the guise of expert testimony."  (DN 36, at p. 13 (quoting United States v. v. Gordon, 493 F. App'x 617, 626 (6th Cir. 2012)).   Specifically, JC opposes Ms. Holt's understanding of "trademark genericness" and the "doctrine of secondary meaning" and her opinion that Dr. Peloza should have addressed these legal issues (DN 36, at p. 14).

Again, an expert's opinion must "stop short of embracing the 'legal terminology'" which frames the ultimate legal conclusion which the jury must reach in the case."  Alvarado v. Oakland County, 809 F. Supp. 2d 680, 688 (E.D. Mich. 2011) (citing Torres v. County of Oakland, et al., 758 F.2d 147, 151 (6th Cir. 1985)).   In the context of trademark infringement, courts have generally found expert conclusions as to whether a mark is valid are inadmissible.  See Ideal World Marketing, Inc. v. Duracell, Inc., 15 F. Supp. 2d 239, 244 n. 2 (E.D.N.Y. 1998) (finding expert opinion that a mark was "suggestive and not descriptive" to be an inadmissible legal

12

opinion); <u>Kern's Kitchen, Inc. v. Bon Appetit</u>, 669 F. Supp. 786, 791 (W.D. Ky. 1987), *rev'd on other grounds*, 850 F.2d 692 (6th Cir. 1988) (finding testimony from expert that mark was not generic to be inadmissible).

Here, Ms. Holt's report does not opine as to legal conclusions.  Although she uses the legal terms "genericness" and "secondary meaning" throughout her opinion, she does not make a determination that the marks at issue are generic or have secondary meaning.   In fact, Ms. Holt concludes only that Dr. Peloza's surveys did not provide any information about genericness or secondary meaning and did not follow one of the preferred survey models, neither of which is an improper legal conclusion.

JC's complaint that Ms. Holt's discussion of Dr. Peloza's survey universes is an improper legal conclusion is similarly unfounded.    Evaluation of the propriety of a survey's universe is one factor in assessing the validity and how much weight a survey should receive.   Ms. Holt's opinion that Dr. Peloza failed to survey the correct universe for determining whether or not "Jewelry Candles" a generic term or has secondary meaning, accordingly, does not suggest an answer to the ultimate issue in this case.

In its contemporaneous opinion ruling on LMI's motions in limine to exclude expert testimony, the Court found that Dr. Peloza's opinions and surveys were admissible and any flaws in the survey could be assessed in weighing the evidence.   The Court finds the same path is prudent as to Ms. Holt's rebuttal report.

<u>ORDER</u>

**IT IS HEREBY ORDERED** that JC's motion in limine to exclude expert testimony (DN 36) is **GRANTED IN PART** and **DENIED IN PART**.

As to Dr. Morris, JC's motion is **GRANTED**, and his report is excluded.

As to Mr. Howard, JC's motion is **GRANTED** in that his ultimate conclusion as to likelihood of confusion and his speculation regarding what type of designer created the logos at issue should be excluded.   However, JC's motion is **DENIED** as to the remainder of Mr. Howard's opinion.

As to Ms. Holt, JC's motion is **DENIED**.

Copies:        Counsel of Record

14